JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Gregory Nelson

## DEFENDANTS
Bollman Hat Factory

**(b)** County of Residence of First Listed Plaintiff: **Berks**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: **Lancaster**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Miller Law Group, PLLC, 25 Stevens Avenue
West Lawn, PA 19609 (610) 670-9000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane / 365 Personal Injury - Product Liability | 690 Other | 423 Withdrawal 28 USC 157 | 376 Qui Tam (31 USC 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability / 367 Health Care/ Pharmaceutical Personal Injury Product Liability |  | **INTELLECTUAL PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander |  | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability / 368 Asbestos Personal Injury Product Liability |  | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine |  | 835 Patent - Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability |  | 840 Trademark | 460 Deportation |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle / **PERSONAL PROPERTY** / 370 Other Fraud | **LABOR** | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced and Corrupt Organizations |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability / 371 Truth in Lending | 710 Fair Labor Standards Act |  | 480 Consumer Credit (15 USC 1681 or 1692) |
| 190 Other Contract | 360 Other Personal Injury / 380 Other Personal Property Damage | 720 Labor/Management Relations | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| 195 Contract Product Liability | 362 Personal Injury - Medical Malpractice / 385 Property Damage Product Liability | 740 Railway Labor Act | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 196 Franchise |  | 751 Family and Medical Leave Act | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | 790 Other Labor Litigation | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 210 Land Condemnation | [x] 440 Other Civil Rights / **Habeas Corpus:** | 791 Employee Retirement Income Security Act | 864 SSID Title XVI | 891 Agricultural Acts |
| 220 Foreclosure | 441 Voting / 463 Alien Detainee |  | 865 RSI (405(g)) | 893 Environmental Matters |
| 230 Rent Lease & Ejectment | 442 Employment / 510 Motions to Vacate Sentence |  | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 240 Torts to Land | 443 Housing/ Accommodations / 530 General |  | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 245 Tort Product Liability | 445 Amer. w/Disabilities - Employment / 535 Death Penalty | **IMMIGRATION** | 871 IRS—Third Party 26 USC 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 290 All Other Real Property | 446 Amer. w/Disabilities - Other / **Other:** / 540 Mandamus & Other | 462 Naturalization Application |  | 950 Constitutionality of State Statutes |
|  | 448 Education / 550 Civil Rights | 465 Other Immigration Actions |  |  |
|  | 555 Prison Condition |  |  |  |
|  | 560 Civil Detainee - Conditions of Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. Sections 2000e to 2000e-17

Brief description of cause:
Employment Discrimination based on Race and Color, Wrongful Termination

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE _____ SIGNATURE OF ATTORNEY OF RECORD *(signature)*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
for the

Eastern District of Pennsylvania

| | |
|---|---|
| <u>GREGORY NELSON,</u><br>    *Plaintiff,*<br><br>              v.<br><br><br><br><u>BOLLMAN HAT FACTORY,</u><br>    *Defendants.* | )<br>)  Case No._____<br>)<br>)<br>)<br>)<br>)  Jury Trial:   [X] Yes      [ ] No<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

AND NOW, Comes, Plaintiff, Gregory Nelson, by and through his attorneys, Larry W. Miller, Jr., Esquire, and the Miller Law Group, PLLC, and files this Complaint against Defendants, and in support thereof, avers as follows:

### PARTIES TO THE COMPLAINT

1. Plaintiff is Gregory Nelson, an adult individual who resides at 210 N. Church Street, Mohnton, Berks County, PA 19540. (hereinafter "Nelson").

2. The Defendant is the employer, Bollman Hat Factory a Pennsylvania company with a primary business address of 110 E. Main Street, Adamstown, Lancaster County, PA 19601 (hereinafter "Bollman").

## BASIS FOR JURISDICTION

3. The acts or occurrences giving rise to this complaint all occurred in Lancaster County, Pennsylvania.

4. This action is brought for discrimination in employment pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17.

## AS AND FOR A FIRST CAUSE OF ACTION

5. Bollman discriminated against Nelson based upon his race and color.

6. The alleged racial slurs and discriminatory acts began in approximately 2010 and continued until Nelson's termination on February 9, 2021.

## AS AND FOR A SECOND CAUSE OF ACTION
### (As Pursuant to 43 P.S. §§ 211.1—211.39)

7. The discriminatory conduct complained in this action includes unequal terms and conditions of employment, retaliation, and the wrongful termination of Nelson's employment.

## FACTS OF THE CASE

8. Nelson began working for Bollman on January 3, 2003, as a machine operator. He was a material handler when he was terminated.

9. Until the alleged incidents which led to Nelson's termination, Nelson was an otherwise dedicated employee and had been given "Wally Service Awards" and other commendations on 27 occasions during his 18-year employment at Bollman. Nelson enjoyed working at Bollman and took an avid interest in cross-training to expand his knowledge at Bollman.

10. At some point between 2018-2019, Bollman introduced walkie-talkie radios for communication within the facilities. The CEO, President, HR Director, all Managers, Nelson and a fellow material handler used the radios and all had access to hear every aired

communication. When using the radio to call Nelson, Manager Jamie Dale (Dale) would refer to Nelson as "Dark Vader" inappropriately referring to Nelson's skin color.

11. On one such occurrence, another manager, Greg Leach (Leach) after hearing the derogatory reference, came from another floor to speak with Nelson about him being called "Dark Vader." An appalled Leach said, "that's not right" and indicated he would speak with Rich Bainbridge (who was in charge of manufacturing). But nothing changed. Dale continued to refer to Nelson as "Dark Vader" in open radio communications and Bollman blatantly did nothing to correct it. Other employees in charge would tell Nelson, "I'll take care of it" but, the racial discrimination never stopped.

12. In April 2017, in the presence of Mark John and Nelson, Manager Wally Rotiserie was talking about food stamps and how "spics and niggers" were on them. Nelson interrupted Wally, expressed his disgust with the racial slurs and walked away. Nelson reported this incident to his then supervisor who directed him to file a report with Bollman's Human Resources Department, which Nelson did. Bollman offered an apology to Nelson but Bollman took no further action regarding the matter.

13. While working, Dale was having a conversation with other employees about the Philadelphia Eagles. Nelson, who was standing nearby, attempted to add to the conversation when Dale sternly said to Nelson "Turn your black ass around and get back to work."

14. The racial slur "nigger" was uttered frequently to and around Nelson and in spite of Nelson's known objections and reports. Some managers would smirk or smile when they overheard the racial slurs. During Nelson's 18 years of employment, Bollman did nothing to change the discriminatory behaviors of its employees.

15. Meredith Miller (Miller) became Nelson's direct supervisor in June of 2020. On June 8, 2020, Nelson met with Miller to review his job description and discuss the goals and expectations for Nelson. On June 11, 2020, Nelson was asked to sign a summary of the June 8, 2020, meeting with Miller called "Notes of discussion with Greg Nelson" (Hereinafter "Notes"). (*EXHIBIT A*)

16. On or about August 10, 2020, Nelson observed two Bollman maintenance employees removing copper and other scrap materials out of the dumpsters and place them into the employees' private owned pick-up trucks which is expressly against Bollman company policy. Nelson made a video of this activity and shared the video and reported the incident to Miller approximately August 10, 2020.

17. Nelson expected confidentiality when he reported the theft of materials to Miller. After the report was made, Nelson was subjected to harassment from other employees along with being falsely accused of unprofessional behavior. Nelson found out from other employees they knew all about the report he made regarding the theft of the materials, despite the implied confidentiality. From that point, Nelson felt he could no longer trust his chain of command.

18. While on Covid-19 quarantine, Nelson received a call from H.R. Director Kim Hubric (Hubric) at his home and was told he was being placed on paid administrative leave for 7 days pending an investigation. When he returned to work, Nelson was told pursuant to the stipulations listed in a document called "Last Chance Agreement" (Hereinafter "Agreement"). (*EXHIBIT B*) The document specified a "formal conversation" with Nelson on June 10, 2020. The only evidence of a "formal conversation" is the "Notes" document from June 8, 2020, signed on June 11, 2020, for which Nelson believed was to review his job description and set goals under his new supervisor, not a reprimand nor a write-up. Additionally, the "Agreement" stated a second

"formal meeting" (purportedly held as another reprimand) occurred on August 13, 2020. The original "Notes" document had been visibly altered to include a note in the right margin which appears to be written by Doug Sachs which reads "Reviewed with Greg 8/13/2020" with the initials "GN". Nelson recalls no such meeting on August 13, 2020, and moreover states that is not his handwriting for the initials "GN" on the modified "Notes" document. (*EXHIBIT C*)

19. Nelson returned to work on or about November 30, 2020 and signed the "Last Chance Agreement" after objecting to the document including the unknown meeting of August 13, 2020. Nelson began feeling he was being held to standards that were not being used for other employees in the company and that he had become a target for termination.

20. Throughout the month of December, the tension at Bollman surrounding Nelson was palpable. When walking through the maintenance department, the employee he reported for stealing copper said to Nelson "I can't believe your black ass is still here."

21. On or about January 6, 2021, Nelson observed a picture of himself (taken from the Inc. magazine featured company article) hanging on the Maintenance Manager's door with a written caption which read "$.50 reward for anyone who catches this person". (EXHIBIT D) Nelson instantly felt demeaned, racially threatened, and no longer felt comfortable at Bollman. Nelson reported the incident to Miller and by the end of the day on January 7, 2021, Nelson was called Hubric's office to discuss the incident. Hubric apologized to Nelson and advised there would be an investigation. Nelson asked Hubric for answers to four (4) questions: 1) How long had the picture been posted on the door? 2) Why was it posted? 3) What was the meaning of the caption? 4) Who posted it? After the conversation with Hubric, Nelson figured it out that the person who posted the offensive picture was the Maintenance Manager, Kevin Fry. Nelson was so disturbed by the incident he began seeing a therapist to cope with the anxiety and stress of the

mistreatment and discrimination while continuing to work at Bollman and he continued to see the therapist through December 2021.

22. Nelson was called to the HR Department on January 11, 2021 to meet with Hubric and Miller. Hubric apologized again about the posting incident and stated that disciplinary actions will be taken upon the person who did it. Nelson advised Hubric that he could not keep going through this torment at work, repeatedly feeling discriminated against while nothing was being done by Bollman to correct it.

23. Nelson went to Company President Don Rongione's (Rongione) office on or about the morning of January 13, 2021. While Nelson was in Rongione's office CEO Craig Womelsdorf (Womelsdorf) arrived. Womelsdorf acknowledged that he knew of the picture incident and apologized to Nelson for that type of unacceptable behavior. Womelsdorf was unable to explain the reasoning for the picture and said confidentiality prevented him from disclosing who had done such a disrespectful act.

24. On January 18, 2021, Nelson went to the HR Department and spoke with Carol to review his personnel file for the purpose of checking the date of the slur incident report from 2017 however, the report of the racial slur was no longer in Nelson's file. Carol could offer no explanation for the missing report other than the former HR Director (who retired from the company in June 2019) may have removed it. Throughout the rest of the meeting with Carol, she interspersed utterances to Nelson of "I know what you're doing." "I know you're getting a lawyer." "He didn't mean what he did." "It was a joke." "If you are not happy here in this company, then why are you still here?" "Why not get another job?" Finally, feeling completely demoralized and absolutely unheard, Nelson said nothing further and left Carol's office.

25. While in the meeting with Carol in the HR Department on January 18, 2021, Womelsdorf came by and asked Nelson to come to his office to speak with him, which Nelson did after leaving Carol's office. Again, acknowledging the objectionable incidents Nelson had encountered, Womelsdorf explained to Nelson that "everyone" (at Bollman) will have to do "Harassment Training" on Thursday, February 4, 2021. This was the first time in Nelson's 18-year history with Bollman that any sensitivity/diversity training was being conducted. Womelsdorf went on to ask Nelson if he was willing to accept an apology from the person who posted the offensive picture on the Maintenance Manager's door. Due to the level of disgust that he felt, Nelson advised Womelsdorf he could not accept an apology from the offender.

26. On February 3, 2020, Bollman stated that Nelson engaged in an aggressive and profane-filled conversation with Jamie Dale. Nelson vehemently denies those allegations and obtained written statements from three (3) employees who were in the very same area and witnessed the conversation. The employees specifically refuted that any raised voices or profanity was used by Nelson.

27. Bollman also stated that Nelson approached another employee on February 3, 2021 asking if she reported him to HR. Nelson denies this ever happened.

28. On February 4, 2021 Miller stated that Nelson used inappropriate language to her when she asked him a question. Nelson denies that occurred.

29. Nelson logged on and attended the audio Discriminatory Harassment Training on February 4, 2021. At the end of the training, Nelson had some questions for which he was not provided answers. Nelson was asked to sign an acknowledgement form for the training he received. Because previous acknowledgement forms that Nelson signed turned out to be disguised as write-ups and reprimands, he respectfully refused to sign the training form until he

could speak with H.R. Department about his questions. Miller advised Nelson that she was marking Nelson's training form as "Refused to sign" instead of resolving Nelson's questions (EXHIBIT E).

30. On or about January 29, 2021, as Nelson was moving cardboard strips via the elevator, the cardboard shifted and spilled. Nelson repositioned the cardboard promptly. Miller advised Nelson she received an email complaining that Nelson intentionally held up the elevator causing other employees to be inconvenienced. Nelson determined the email came from Dale and was just another malicious attempt to discredit Nelson.

31. Miller stated she requested Nelson to move some cardboard on February 4, 2021, which he did. Miller observed on February 5, 2021, the cardboard was still in place (another plant hadn't picked it up the previous evening. Miller requested the cardboard be moved again to a different location. Miller stated that Nelson became angry and walked away. Nelson denies this allegation.

32. On February 8, 2021, Miller requested Nelson to use an Unmounted Ring Machine that was deemed unsafe to use by Miller. Nelson reminded Miller that she advised Nelson that the machine was not safe to use for which Miller advised Nelson "You have my permission to use it (the machine)." Nelson respectfully refused. (EXHIBIT F)

33. Nelson was terminated from Bollman on February 9, 2021. The <u>Notice of Termination of Employment</u> (EXHIBIT G) cited Nelson violated the "Agreement" by his specific behavior of February 3 and 4 which Nelson disagrees ever occurred.

## EXAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

34.   Nelson filed a Pre-Charge Inquiry on January 29, 2021 and discrimination charge against Bollman through U.S. Equal Employment Opportunity Commission (EEOC) on February 11, 2021, under charge number 530-2021-01702.

35.   After completing their investigation, the EEOC issued Nelson a <u>Dismissal and Notice of Rights</u> with <u>Notice of Suit Rights</u> dated October 21, 2021. (*EXHIBIT H*)

## RELIEF

36.   WHEREFORE, Plaintiff prays this Court enter judgment and decree for Plaintiff and against the Defendants as follows:

   A.   A judgment in favor of Plaintiff finding that Defendants egregious and outrageous behavior against Plaintiff was in direct violation of Title VII of the Civil Rights Act of 1964, amended.

   B.   A judgment to Plaintiff finding that the Defendants willfully and intentionally discriminated against Plaintiff in direct violation of 43 P.S. §§ 211.1—211.39 which resulted in Plaintiff's wrongful termination.

   C.   Ordering that Defendants reimburse Plaintiff for his lost wages since his wrongful termination.

   D.   Ordering that Defendants be responsible for Plaintiff's out of pocket expenses for therapy.

   E.   Ordering that Defendants be required to pay all costs of this action, including all attorney's fees.

   F.   Ordering that due to Defendant's egregious and outrageous behavior Defendants be required to pay Plaintiff punitive damages in an amount of not less than Three Hundred Thousand Dollars ($300,000.00).

## CERTIFICATION AND CLOSING

      Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11

Respectfully Submitted,

Dated: <u>January 18, 2022</u>

_____
Larry W. Miller, Jr., Esquire
Attorney ID # 86007
Miller Law Group, PLLC
25 Stevens Avenue
West Lawn, PA 19609
Voice:(610) 670-9000
Fax:   (610) 670-9901